IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 13-cv-03243-RBJ

SENAYET TUFFA, SADIA ABDUSALEM, AGNES AIDOO, MARY BOATEMAH, AMINA
BORIYO, NURIDA BORIYO, LENSSA BUBA, ABDI CHALTU, TIGEST DESTA,
ELASABETH GETACHEW, ZEWDINEH GIZAW, BANCHEAMLAK HAILU, KAMIRIYA
JIMJIMO, BERHANE KIDANE, MAKIDA LESISO, ADDISALEM NIGATU, OSHAIK
OWMAR, MOMINA TUFA, FIKERETE WAKJIRA, ROBDU WALIO, REDA WELANSA,
SHEWANARGAW WOLDETSDICK, and GEZAHEGNE WOLDHNNA,

　　　　Plaintiffs,

v.

FLIGHT SERVICES & SYSTEMS INC.,

　　　　Defendant.

---

## ORDER

---

　　　　The twenty-three plaintiffs in this case, all former employees of Defendant Flight
Services & Systems, Inc. ("FSS"), assert national origin and race discrimination claims under
Title VII in connection with their terminations.  The case is presently before the Court on
Defendant's Motion for Summary Judgment [ECF No. 35].  For the reasons laid out below, the
motion is denied.

## I.  FACTS

　　　　The present dispute originated when Defendant FSS purchased the assets of Freedom Air,
Inc. ("FAI"), effective on or about October 16, 2009.  ECF No. 35 at 2; ECF No. 36 at 1.  Under
the purchase agreement, FSS assumed the obligations of FAI's contract with Southwest Airlines,

1

the Core Airport Support Services Agreement ("CASSA"), at Denver International Airport.  ECF No. 35 at 2; ECF No. 36 at 1.  Plaintiffs, who had all previously worked for FAI as wheelchair attendants, were employed by Defendant in the same role.  ECF No. 35 at 3; ECF No. 36 at 1; Attestation of Barry Simpson, ECF No. 36, Ex. 1 at 1.[1]  All but two or three of the plaintiffs are originally from Ethiopia; the others are from Ghana and Sudan.  Attestation of Gezahegne Woldhnna, ECF No. 36, Ex. 5 at 2; Attestation of Senayet Tuffa, ECF No. 36, Ex. 6 at 2.  In fact, just before FSS took over, FAI had approximately 200 employees in the field, all but 10–15 of whom were from African countries, primarily Ethiopia.  Attestation of Barry Simpson, ECF No. 36, Ex. 1 at 1.

Plaintiffs' ability to speak, read, and write in English is a central issue in this case.  The CASSA requires that FSS wheelchair attendants "possess the ability to communicate effectively in English."  ECF No. 35 at 2; ECF No. 36 at 1.  According to FSS, the position of wheelchair attendant requires the ability to speak, read, and write in English.  Collier Affidavit, ECF No. 35, Ex. B at 2.  A few months before FSS took over, in August of 2009, FAI had received a letter from Southwest listing several service deficiencies, including the "[l]anguage barrier between wheelchair attendants and Employees/Customers."  ECF No. 35, Ex. C; ECF No. 36 at 2 (plaintiffs admit that FAI received the notice).  However, according to Barry Simpson, plaintiffs' former supervisor at FAI, all of the plaintiffs "understood English well enough to do their jobs even if they could not speak it well."  Attestation of Barry Simpson, ECF No. 36, Ex. 1 at 1.  Mr. Simpson was never asked to follow up on the complaint from Southwest, and he did not receive

---

[1] Defendant points out that none of plaintiffs' attestations are notarized.  ECF No. 37 at 2.  That is true.  However, they all comply with the requirements of 28 U.S.C. § 1746 (and explicitly state so); thus the Court sees no problem with plaintiffs' reliance on these attestations.

any other notice of problems with his employees' English-speaking abilities during the 2.5 years he was at FAI.  *Id.* at 2.

Plaintiffs contend that once FSS took over, it set out to terminate all the employees of African origin.  According to Mr. Simpson, "during the one or two week overlap with FSS, [he] spoke with the incoming operations manager for FSS, Tom Mills."  *Id.* at 1–2.  During their conversation, Mr. Simpson told Mr. Mills that FSS "had numerous Ethiopian employees and that they did not speak English well, but that they were good workers and we had no problems with them.  [Mr. Mills] told [Mr. Simpson] something along the lines of not to worry because the company was going to get rid of them."  *Id.*  According to plaintiffs, FSS then came up with a number of reasons to terminate the employees of African origin.

First, several of the plaintiffs (Sadia Abdusalem, Mary Boatemah, Lensa Buba, Abdi Chaltu, Elasabeth Getachew, Kamiriya Jimjimo, Berhane Kidane, Makida Lesiso, Oshaik Owmar, Momina Tufa, Fikerete Wakjira, and Robdu Walio) were terminated because they failed the required the DIA security badge test.  ECF No. 35 at 4; ECF No. 36 at 1.  The parties agree that plaintiffs' continued employment as wheelchair attendants was conditioned upon passing the badge test, which is governed by federal regulation.  ECF No. 35 at 3; ECF No. 36 at 1.  FAI had always provided someone who could read the test to its employees in English.  Attestation of Barry Simpson, ECF No. 36, Ex. 1 at 1.  However, FSS did not provide such assistance to any employee, and the plaintiffs listed above failed the test.  ECF No. 35 at 4; ECF No. 36 at 1.  According to one plaintiff's account, she did not pass, as she had for several years previously, because FSS refused to provide an English reader.  Attestation of Amina Boriya, ECF No. 36,

Ex. 2.[2]  She attests that others failed for the same reason.  *Id.*

A second group of plaintiffs (Agnes Aidoo, Nurida Borijo, Zewdinah Gizaw, Bancheamlak Hailu, Addisalem Nigatu, and Reda Welansa) was terminated because they did not pass a required training test administered by FSS.  ECF No. 35 at 4; ECF No. 36 at 1.  This test was also a written test given in English, and FSS did not provide language or reading assistance to any of its employees.  ECF No. 35 at 4; ECF No. 36 at 1.

The final four plaintiffs are no longer at FSS for individualized reasons.  The plaintiffs and defendant disagree substantially about the circumstances surrounding their departures.  Beginning with Tigest Desta, FSS contends that she was terminated for job abandonment because she took a leave of absence at a time when she was not yet eligible to do so.  Collier Affidavit, ECF No. 35, Ex. B at 3, Ex. H.  According to Ms. Desta, however, her supervisor, Mr. Mills, gave her permission to take leave so she could care for her father in Ethiopia for one month.  Attestation of Tigest Desta, ECF No. 36, Ex. 3.  When she returned, someone at the FSS office told her that she was no longer employed.  *Id.*

FSS also asserts that plaintiff Shawananargaw Woldetsdick was terminated for job abandonment.[3]  Collier Affidavit, ECF No. 35, Ex. B at 3, Ex. H.  Mr. Woldetsdick contends that he showed up one day only to be told he was no longer on the schedule, and that he should turn his badge in and go home.  Attestation of Shawananargaw Woldetsdick, ECF No. 36, Ex. 4.

Plaintiff Gezahegne Woldhnna was terminated for excessive tardiness, according to FSS.

---

[2] Defendant complains that Plaintiff Boriya did not sign her attestation, but rather printed her name.  ECF No.37 at 2.  The name is handwritten on the attestation, *see* Attestation of Amina Boriya, ECF No. 36, Ex. 2; the Court will not concern itself with the style in which plaintiff wrote it.

[3] There is some confusion about the spelling of this plaintiff's name.  In different places, it has been spelled "Woldetsdick" and "Woldepseick."  The former spelling appears on the plaintiff's attestation, so the Court uses that spelling here.

Collier Affidavit, ECF No. 35, Ex. B at 4.  On Mr. Woldhnna's version of the facts, after he passed both the security test and the training test, FSS changed his schedule such that it conflicted with the set schedule he had at his other job, causing him to be late regularly. Attestation of Gezahegne Woldhnna, ECF No. 36, Ex. 5 at 1.  When he brought this to the attention of Mr. Mills, he said that if he were to change the schedule back, he (Mr. Mills) would lose his job. *Id.*

Finally, FSS asserts that Plaintiff Senayet Tuffa refused to claim tips as wages, and then, when given the choice to do so or instead work as a baggage handler, she refused both options and quit.  Collier Affidavit, ECF No. 35, Ex. B at 4.  Ms. Tuffa, however, contends that Mr. Mills told her to claim enough in tips so that her hourly wage would equal the minimum wage of $7.75 (her regular pay was $5.25), even though she did not actually earn that amount in tips. Attestation of Senayet Tuffa, ECF No. 36, Ex. 6 at 1.[4]  When she refused, Mr. Mills said that the only minimum-wage job he could give her was a position as a baggage attendant.  *Id.*  Ms. Tuffa could not perform that job because she was 49 years old and unable to lift the baggage (no other women were employed as baggage attendants).  *Id.*  One week after this conversation took place, FSS terminated Ms. Tuffa.  *Id.* at 2.

By June of 2010, "only a few" Ethiopians were still employed by FSS, despite the fact that nearly 200 had held positions there when FSS took over.  Attestation of Shawananargaw Woldetsdick, ECF No. 36, Ex. 4; Attestation of Barry Simpson, ECF No. 36, Ex. 1 at 1.  Indeed, at one point, FSS was terminating as many as ten Ethiopians per day.  Attestation of Senayet

---

[4] Defendant asserts that Plaintiff Tuffa's attestation is not signed at all.  ECF No. 37 at 2.  However, it appears that, and the Court accepts that, the writing below plaintiff's printed name and the date is Ms. Tuffa's signature.  *See* Attestation of Senayet Tuffa, ECF No. 36, Ex. 6 at 2.

Tuffa, ECF No. 36, Ex. 6 at 2.  No terminated Ethiopian was replaced by a person of African

origin.  Attestation of Shawananargaw Woldetsdick, ECF No. 36, Ex. 4; Attestation of

Gezahegne Woldhnna, ECF No. 36, Ex. 5 at 2.[5]

Plaintiffs now bring claims against FSS for race and national origin discrimination under

Title VII, 42 U.S.C. §2000e-2(a)(1).  Defendant moves for summary judgment on all of

plaintiffs' claims.

## II.  DISCUSSION

### A.  __Summary Judgment Standard.__

The Court may grant summary judgment if "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The

moving party has the burden to show that there is an absence of evidence to support the

nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The nonmoving

party must "designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324.  A

fact is material "if under the substantive law it is essential to the proper disposition of the claim."

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A material fact is genuine if "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

The Court will examine the factual record and make reasonable inferences therefrom in the light

most favorable to the party opposing summary judgment.  *Concrete Works of Colorado, Inc. v.*

---

[5] Plaintiffs also cite to the EEOC's determination that there is reasonable cause to believe a Title VII violation occurred with respect to the plaintiffs who were not provided language assistance on written tests, arguing that it is admissible under Rule 803.  *See* ECF No. 36 at 7.  Because the Court finds in plaintiffs' favor without considering the EEOC finding, the Court declines to address this point at this time.

*City and County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

      **B.  Merits.**

      Plaintiffs assert claims for national origin and race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), which states that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin."  To prevail on a disparate treatment claim under Title VII, plaintiffs "must establish intentional discrimination through either direct or indirect evidence."  *Orr v. City Of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005); *see also Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1000 n.8 (10th Cir. 2011) (clarifying that "direct evidence" in this context refers to a direct method of proof, meaning evidence that directly reflects the forbidden animus).  Here, plaintiffs contend that they have both direct and indirect methods of proof to support their Title VII claim.

      **1.  Direct Proof.**

      "Direct evidence requires proof of an existing policy which itself constitutes discrimination or oral or written statements on the part of a defendant showing a discriminatory motivation."  *Cuenca v. Univ. of Kansas*, 101 F. App'x 782, 788 (10th Cir. 2004) (internal citations and quotations omitted).  It is "evidence, which if believed, proves the existence of a fact in issue without inference or presumption. . . . A statement that can plausibly be interpreted two different ways—one discriminatory and the other benign—does not directly reflect illegal animus, and, thus, does not constitute direct evidence."  *Hall v. U.S. Dep't of Labor, Admin. Review Bd.*, 476 F.3d 847, 854–55 (10th Cir. 2007).  Plaintiffs cite two pieces of evidence as

direct proof: Mr. Mill's statement about "getting rid" of certain employees, and FSS's policy of requiring employees to take written tests in English.  The Court will address each in turn.

First, plaintiffs present evidence that, during the transition from FAI to FSS management, Mr. Simpson told Mr. Mills that FSS "had numerous Ethiopian employees and that they did not speak English well, but that they were good workers and [FSS] had no problems with them." Attestation of Barry Simpson, ECF No. 36, Ex. 1 at 1.  According to Mr. Simpson, Mr. Mills responded with "something along the lines of not to worry because the company was going to get rid of them."  *Id.*  Plaintiffs contend that Mr. Mills meant that the employees' language skills were irrelevant because FSS planned on terminating all the employees of African origin anyway. However, another plausible interpretation of this statement is that FSS planned to terminate any employee that did not speak English well.  On this latter interpretation, the statement is not direct evidence of race or national origin discrimination because it does not openly convey the necessary discriminatory motivation.  *See Cuenca*, 101 F. App'x at 788.  Because there are two plausible interpretations of Mr. Mill's statement, one of which is benign,[6] it cannot serve as direct evidence.  *See Hall*, 476 F.3d at 854–55.  *See also Martinez v. Target Corp.*, 384 F. App'x 840, 848–49 (10th Cir. 2010) (statement that supervisor was going to clean out the "old crew" of the previous store manager was not direct evidence because it was only discriminatory if it referred to employees over 40 rather than employees who worked under the prior manager).

Plaintiffs also contend that FSS's policy of requiring employees to pass written tests in English, when such skills had no bearing on their job performance, is direct proof of

---

[6] Federal courts have recognized that discrimination on the basis of one's ability to speak English does not itself constitute national origin discrimination.  *See, e.g.*, *Velasquez v. Goldwater Mem'l Hosp.*, 88 F. Supp. 2d 257, 262 (S.D.N.Y. 2000) ("Classification on the basis of language does not by itself identify members of a suspect class and would not support an inference of intentional national origin discrimination.").

discrimination.  ECF No. 36 at 10.  However, an employer's policy only constitutes direct evidence of discrimination if it is discriminatory on its face.  *See Ramsey v. City & Cnty. of Denver*, 907 F.2d 1004, 1008 (10th Cir. 1990) (discussing Supreme Court precedent in which there was direct evidence "that the method of transfer available to a disqualified flight captain depended on his age.  The policy was thus discriminatory on its face.").  *See also Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1118 (10th Cir. 2007) ("[Tenth Circuit] precedent makes clear that evidence is not 'direct' if an inference of discrimination is required.").  A policy requiring employees to read in English does not discriminate on its face.  Thus the requirement that employees pass a written test in English is not direct evidence of discrimination.[7]

## 2. <u>Indirect Proof.</u>

"If there is no direct evidence of discrimination, the *McDonnell Douglas* burden-shifting framework is used to indirectly prove intentional discrimination."  *Orr v. City Of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005).  Under the *McDonnell Douglas* approach, plaintiffs first must make out a prima facie case of discrimination.  *Id.*  Doing so requires a plaintiff to show that "(1) he was a member of a protected class; (2) he was qualified and satisfactorily performing his job; and (3) he was terminated under circumstances giving rise to an inference of

---

[7] The cases that plaintiffs cite in support of their argument that this policy constitutes direct evidence of discrimination discuss the analyses used in disparate <u>impact</u> and hostile work environment cases, not the standard for direct evidence in a disparate <u>treatment</u> case like the present one.  *See* ECF No. 36 at 10–12.  The plaintiffs here assert claims based on intentional discrimination; their response makes no argument based on a disparate impact or hostile work environment theory.  *See* ECF No. 36 at 18 n.9 ("Plaintiffs are not asserting a disparate impact claim, which provides little monetary relief; rather, they are asserting a traditional claim of discriminatory termination.").  *See also Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1220–21 (10th Cir. 2013) (laying out the test applicable in disparate impact cases); *Semsroth v. City of Wichita*, 304 F. App'x 707, 721 (10th Cir. 2008) (laying out the test applicable in hostile work environment cases).  The section of *Maldonado* that plaintiffs discuss, *see* ECF No. 36 at 11, is in a portion of the opinion addressing whether the plaintiffs there had made out a prima facie disparate impact claim.  *See Maldonado v. City of Altus*, 433 F.3d 1294, 1305 (10th Cir. 2006).  Similarly, plaintiffs cite to *Montes* for the proposition that English-only instructions can create a "hostile atmosphere."  *See Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1170 (10th Cir. 2007) (analyzing a hostile work environment claim).  Neither of these cases addresses when an employer's policy can serve as direct evidence of intentional discrimination.

discrimination." *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 505 (10th Cir. 2012).  This stage in

the *McDonnell Douglas* framework is "not onerous."  *Orr*, 417 F.3d at 1152.  "[I]f a plaintiff can

make out a prima facie case of discrimination, the burden shifts to the defendant to demonstrate a

legitimate non-discriminatory reason for the adverse employment action.  If the defendant meets

this burden, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered

reason is pretext."  *Id.* at 1149.  "Evidence of pretext, plus the establishment of a prima facie

case, is sufficient to avoid summary judgment, and plaintiff is not required to present direct

evidence of an illegal discriminatory motive."  *Cordova v. W.*, 925 F. Supp. 704, 708 (D. Colo.

1996).

        In the present case, defendant argues that plaintiffs cannot establish the second and third

elements of a prima facie case of discrimination,[8] then goes on to offer non-discriminatory

reasons for terminating plaintiffs' employment.  Plaintiffs assert that defendant's given reasons

are all pretextual.  The Court will address each point in turn.

        a.  **Plaintiffs' Qualifications and Job Performance.**

        The second element of a prima facie case requires plaintiffs to show that they were

"qualified and satisfactorily performing [their] job[s]."  *Barlow*, 703 F.3d at 505.  Defendants

argue that (1) certain plaintiffs were not qualified for their positions because they could not

obtain the necessary security badge, (2) others were not qualified because they could not pass

FSS's training test, (3) both groups were not qualified because they were not fluent in English,

and (4) a final group did not have satisfactory job performance.  ECF No. 35 at 8–10.  These are

essentially the same reasons that defendant offers in the second step of the *McDonnell Douglas*

---

[8] Defendant's motion does not address the first element of a prima facie case.  *See* ECF No. 35 at 8–12.  There does
not appear to be any debate about the fact that plaintiffs are members of a protected class.

analysis, under which the defendant must put forth legitimate non-discriminatory reasons for its

actions. *See* ECF No. 35 at 13–14. Courts generally resist attempts to collapse this second step

of the analysis into the second element of the prima facie test. The Tenth Circuit has held that:

> When an employee's failure to meet objective, employer-imposed criteria is one
> of the legitimate, non-discriminatory reasons advanced by an employer to dispel
> the inference of discrimination raised by an employee at the prima facie stage, it
> cannot also be used to defeat the employee's prima facie case. To hold otherwise
> would be tantamount to collapsing the first and second stages of the *McDonnell
> Douglas* analysis and would deny a plaintiff the opportunity to demonstrate that
> the defendant's explanation for the adverse employment action is pretextual. . . .
> The relevant inquiry at the prima facie stage is not whether an employee or
> potential employee is able to meet all the objective criteria adopted by the
> employer, but whether the employee has introduced some evidence that she
> possesses the objective qualifications *necessary to perform the job sought.*

*E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1193–94 (10th Cir. 2000) (emphasis

in original) (internal citations and quotations omitted). Thus the analysis at the prima facie stage

focuses on whether the employees have presented some evidence that they were qualified to

perform their jobs and that they were satisfactorily doing so.

### i.   <u>Qualifications</u>

The Court first turns to the question of whether the nineteen plaintiffs who failed either

the security or training test were qualified for their positions. "[T]o meet the prima facie case,

plaintiff need only present some credible evidence, including her own testimony, that she was

minimally qualified to perform the position sought." *Griffis v. City of Norman*, 232 F.3d 901

(10th Cir. 2000). This analysis turns on the qualifications "necessary to perform the job," not

any objective criteria adopted by the employer. *Horizon/CMS Healthcare Corp.*, 220 F.3d at

1193–94. In the present case, plaintiffs have presented at least some evidence that they were

minimally qualified for their positions—namely that they had been performing them when

employed by FAI.  *See* Attestation of Barry Simpson, ECF No. 36, Ex. 1 at 1.  Indeed, their former supervisor asserts that they were "good employees" and that they could speak English well enough to perform their jobs.  *Id.*  This evidence is sufficient at this stage of the analysis to find that the plaintiffs were at least minimally qualified.[9]  Thus the Court finds that these nineteen plaintiffs have satisfied the second element of their prima facie case.

Defendants' arguments regarding the security test, the training test, and plaintiffs' English fluency are better addressed at the second stage of the *McDonnell Douglas* analysis.  *See Horizon/CMS Healthcare Corp.*, 220 F.3d at 1193–94.  Although obtaining a security badge is a requirement mandated by federal law, passing the written test in English without language assistance is not a part of that requirement.  *See* Attestation of Barry Simpson, ECF No. 36, Ex. 1 at 1.  In other words, taking the test is not an employer-imposed requirement; the additional hurdle of doing so in a written form in English is.  Similarly, passing FSS's internal training test in English and being fluent in English beyond the level necessary to perform the job are both objective employer-imposed criteria.[10]  Under *Horizon/CMS Healthcare Corp.*, these considerations are not appropriately considered at the prima facie stage of the *McDonnell Douglas* analysis.

---

[9] Furthermore, the Tenth Circuit has held that "a plaintiff may make out a prima facie case of discrimination in a discharge case by credible evidence that she continued to possess the objective qualifications she held when she was hired." *MacDonald v. E. Wyoming Mental Health Ctr.*, 941 F.2d 1115, 1121 (10th Cir. 1991) (internal citations omitted).  Defendant has not argued, nor would it make any sense to argue, that plaintiffs' ability to speak English has worsened over time.

[10] It is true that a provision in FSS's contract with Southwest that requires that employees "possess the ability to communicate effectively in English." ECF No. 35 at 2; ECF No. 36 at 1.  However, the nineteen plaintiffs that FSS claims were not qualified for their positions because they were not fluent in English are the same nineteen that were terminated for failing one of the written tests. *See* ECF No. 36 at 8–9.  FSS offers no other explanation for why these nineteen in particular did not possess the necessary language skills, *see id.* at 9; clearly this assertion is based on their failing the tests.  Because passing written tests in English requires a different level of language proficiency than communicating effectively with customers does, this higher level of English proficiency is an employer-imposed criterion, and the argument about plaintiffs' English abilities is better addressed at the second stage of the *McDonnell Douglas* analysis.

### ii.  <u>Job Performance</u>

Defendant also contends that the four plaintiffs terminated for individualized reasons cannot satisfy the second element of the prima facie test because they were not satisfactorily performing their jobs.  ECF No. 35 at 10.  However, "[a] defendant's evidence regarding an employee's work performance should not be considered when determining whether the employee has made a prima facie case of employment discrimination."  *Ellison v. Sandia Nat'l Labs.*, 60 F. App'x 203, 205 (10th Cir. 2003) (internal citations, quotations, and alterations omitted).  Instead, "a plaintiff may establish his prima facie case . . . by his own testimony that his work was satisfactory, even when disputed by his employer, or by evidence that he held his position for a significant period of time."  *Id.* (internal citations, quotations, and alterations omitted).

Here, all four plaintiffs dispute the reasons that FSS gives for characterizing their performance as unsatisfactory.  *See* Attestation of Tigest Desta, ECF No. 36, Ex. 3 (plaintiff claims she was given permission to take leave so she could care for her father in Ethiopia for one month); Attestation of Shawananargaw Woldetsdick, ECF No. 36, Ex. 4 (plaintiff contends that he showed up one day only to be told he was no longer on the schedule and that he should turn his badge in and go home); Attestation of Gezahegne Woldhnna, ECF No. 36, Ex. 5 at 1 (plaintiff asserts that FSS purposely refused to accommodate the schedule at his other job); Attestation of Senayet Tuffa, ECF No. 36, Ex. 6 at 1 (plaintiff claims that FSS fired her for refusing to claim more tips that she received).  Furthermore, their former FAI supervisor asserts, albeit in a rather general statement, that the plaintiffs were all "good employees."  Attestation of Barry Simpson, ECF No. 36, Ex. 1 at 1.  Setting aside defendant's evidence, the Court is

satisfied that these plaintiffs have put forth sufficient evidence to satisfy the second element of their prima facie case.

   b. **Circumstances Giving Rise to an Inference of Discrimination.**

   Defendant also argues that plaintiffs cannot show that they were terminated under circumstances giving rise to an inference of discrimination.  "Plaintiffs can establish evidence of the third prong [of the prima facie test] in various ways, such as actions or remarks made by decisionmakers, preferential treatment given to employees outside the protected class, or more generally, upon the timing or sequence of events leading to plaintiff's termination."  *Barlow*, 703 F.3d at 505 (internal quotations and citations omitted).  Only a "small amount of proof [is] necessary to create an inference of discrimination."  *Orr*, 417 F.3d at 1149 (10th Cir. 2005) (internal citations omitted).

   Plaintiffs have presented ample evidence to clear this low bar.  First, plaintiffs point to the conversation in which Mr. Simpson told Mr. Mills that FAI "had numerous Ethiopian employees and that they did not speak English well, but that they were good workers and [FAI] had no problems with them" and Mr. Mills responded with "something along the lines of not to worry because the company was going to get rid of them."  *See* Attestation of Barry Simpson, ECF No. 36, Ex. 1 at 1.  These facts certainly allow for the inference that FSS aimed to terminate all the Ethiopians and other employees of African origin because of their race and/or national origin.  Second, the sheer number of African employees fired in a fairly short time span gives rise to an inference of discrimination: By June of 2010 "only a few" Ethiopians were still employed by FSS, despite the fact that nearly 200 had held positions there when FSS took over the previous October.  Attestation of Shawananargaw Woldetsdick, ECF No. 36, Ex. 4;

Attestation of Barry Simpson, ECF No. 36, Ex. 1 at 1.  Indeed, at one point, FSS was terminating

as many as ten Ethiopians per day, and not one of the terminated Ethiopians was replaced by

persons of African origin.  *Id.*; Attestation of Senayet Tuffa, ECF No. 36, Ex. 6 at 2.  For these

reasons, the Court finds that plaintiffs have presented sufficient evidence of circumstances giving

rise to an inference of discrimination.[11]

For the reasons laid out above, the Court finds that plaintiffs have succeeded in making

out a prima facie case of intentional discrimination based on race and/or national origin.

### c.  Defendants' Offered Non-Discriminatory Reasons for Plaintiffs' Terminations.

"[I]f a plaintiff can make out a prima facie case of discrimination, the burden shifts to the

defendant to demonstrate a legitimate non-discriminatory reason for the adverse employment

action." *Orr*, 417 F.3d at 1149.  At this stage of the *McDonnell Douglas* framework, a defendant

"does not need to litigate the merits of the reasoning, nor does it need to prove that the reason

relied upon was bona fide, nor does it need to prove that the reasoning was applied in a

nondiscriminatory fashion." *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1224 (10th Cir. 2007)

(internal citations and quotations omitted).  Rather, a defendant "need only explain its actions

against the plaintiff in terms that are not facially prohibited by Title VII." *Id.*

Here, defendant has offered reasons for terminating all of the plaintiffs that are facially

non-discriminatory.  The parties agree that nineteen of the plaintiffs were terminated because

they failed either the security badge test or FSS's internal training test—both of which plaintiffs

were required to take in written form in English.  ECF No. 35 at 3, 4; ECF No. 36 at 1.

---

[11] While defendant's argument that classification on the basis of language does not itself give rise to an inference of discrimination is correct, *see* ECF No. 35 at 11, it is beside the point here.  Plaintiffs cite to evidence beyond the classification based on language—namely, Mr. Mills' remarks to Mr. Simpson and the number of Ethiopians terminated in a short time period—that gives rise to the inference that plaintiffs were discriminated against because of their race or national origin.

Defendant contends that it did not provide language assistance to its employees, as FAI always had, because its contract with Southwest requires that personnel providing service under the contract "possess the ability to communicate effectively in English," and, a few months before FSS took over, FAI had received a letter from Southwest listing the "[l]anguage barrier between wheelchair attendants and Employees/Customers" as a service deficiency.  ECF No. 35 at 2; ECF No. 36 at 1, 2; ECF No. 35, Ex. C.  Furthermore, according to FSS, the position of wheelchair attendant requires the ability to speak, read, and write in English.  Collier Affidavit, ECF No. 35, Ex. B at 2.

As for the remaining four plaintiffs, FSS offers the following reasons for their terminations: Ms. Desta and Mr. Woldetsdick were terminated for job abandonment, Mr. Woldhnna was terminated for excessive tardiness, and Ms. Tuffa refused to claim tips as wages, and then, when given the choice to do so or instead work as a baggage handler, she refused both options and quit.  Collier Affidavit, ECF No. 35, Ex. B at 3, 4, Ex. H.  Thus FSS has explained all the challenged terminations in terms that are not facially discriminatory.

### d.  <u>Pretext</u>

"On summary judgment, once the employer comes forward with a facially nondiscriminatory reason for an adverse employment decision, the plaintiff's burden is only to demonstrate a genuine dispute of material fact as to whether the proffered reasons [are] unworthy of belief." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1321–22 (10th Cir. 1997).  *See also Sanders v. Sw. Bell Tel., L.P.*, 544 F.3d 1101, 1105 (10th Cir. 2008) (citing *Morgan* in Title VII context).  "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable

factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* at 1323. Furthermore, the Tenth Circuit has "definitively rejected a 'pretext plus' standard; in order to survive summary judgment, a plaintiff generally need not provide affirmative evidence of discrimination beyond the prima facie case and evidence that the employer's proffered explanation is pretextual." *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1168 (10th Cir. 2007).

Plaintiffs here have offered sufficient evidence to demonstrate a genuine dispute of material fact as to whether defendant's proffered reasons for their terminations are unworthy of belief. As for the nineteen plaintiffs terminated because they failed either the security or training test, there is evidence that passing these tests requires a level of English proficiency beyond what is required to perform the job of wheelchair attendant. *See* Attestation of Barry Simpson, ECF No. 36, Ex. 1 at 1 (noting that plaintiffs "understood English well enough to do their jobs even if they could not speak it well"). It is true that defendant's contract with Southwest requires that that FSS employees "possess the ability to communicate effectively in English," ECF No. 35 at 2; ECF No. 36 at 1, and that FAI had received a complaint from Southwest about the English proficiency of its wheelchair attendants, ECF No. 35, Ex. C; ECF No. 36 at 2. Nevertheless, there is no reason to believe that the level of English proficiency needed to communicate effectively in English is the same as that required to pass written tests in English. This weakness in defendant's reason for the terminations, combined with evidence that the plaintiffs understood

English well enough to do their jobs, is enough for a reasonable factfinder to conclude that

defendant's explanation is unworthy of credence.[12]

Turning now to the remaining four plaintiffs, each has presented evidence that casts

doubt on the reasons FSS gives for their terminations.  Ms. Desta claims that she did not abandon

her post; on her version of the facts, her supervisor gave her permission to take leave so she

could care for her father in Ethiopia for one month.  Attestation of Tigest Desta, ECF No. 36, Ex.

3.  Similarly, Mr. Woldetsdick contends that he showed up one day only to be told he was no

longer on the schedule and that he should turn his badge in and go home.  Attestation of

Shawananargaw Woldetsdick, ECF No. 36, Ex. 4.  Mr. Woldhnna asserts that FSS changed his

schedule such that it conflicted with the set schedule he had at his other job, causing him to be

late regularly.  Attestation of Gezahegne Woldhnna, ECF No. 36, Ex. 5 at 1.  When he brought

this to the attention of Mr. Mills, he said that if he were to change the schedule back, he (Mr.

Mills) would lose his job.  *Id.*  Finally, Ms. Tuffa contends that she was terminated because she

refused to claim more in tips than she actually made.  Attestation of Senayet Tuffa, ECF No. 36,

Ex. 6 at 1, 2.  These four plaintiffs have offered enough evidence to create a genuine issue of fact

as to whether defendant's stated reasons for their terminations are pretextual.

### III. CONCLUSION

Because plaintiffs have made out a prima facie case and put forth evidence of pretext in

response to defendant's offered reasons for their terminations, they have successfully defeated

---

[12] Again here, defendant's point that discrimination on the basis of employees' English proficiency does not constitute national origin or race discrimination, *see* ECF No. 35 at 13–15, is correct but irrelevant.  Plaintiffs have sufficient evidence to allow a factfinder to deem defendant's explanation for plaintiffs' terminations unworthy of belief; thus, they succeed in defeating defendant's motion for summary judgment.

defendant's motion for summary judgment under the *McDonnell Douglas* framework.  For this

reason, FSS's Motion for Summary Judgment [ECF No. 35] is DENIED.

DATED this 21st day of January, 2015.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge